Argued and submitted March 2, accused suspended from practice of law for 120 days, commencing 60 days from effective date of decision June 28, 2007

In re Complaint as to the Conduct of

# JAMES A. FITZHENRY,
*Accused.*

(OSB No. 03-85; SC S53443)

162 P3d 260

Peter R. Jarvis, Hinshaw & Culbertson LLP, Portland, argued the cause for the accused. With him on the brief were David J. Elkanich, and Barnes H. Ellis, Stoel Rives LLP, Portland.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before, De Muniz, Chief Justice, and Gillette, Durham, Kistler, Walters, and Linder, Justices.*

PER CURIAM

---

\* Balmer, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating Disciplinary Rule (DR) 1-102(A)(3) (prohibiting dishonesty, fraud, deceit, and misrepresentation) of the Oregon Code of Professional Responsibility.[1] A trial panel of the Disciplinary Board concluded that the accused had violated that rule as charged and that his misconduct warranted a suspension from the practice of law for 120 days. Pursuant to ORS 9.536(1) and Bar Rule of Procedure (BR) 10.1, the accused sought this court's review of the trial panel's decision.

■ ■ We review a decision of the trial panel *de novo.* ORS 9.536(2); BR 10.6. The Bar must establish misconduct by clear and convincing evidence, which "means evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993). For the reasons that follow, we conclude that the Bar has proved the alleged violation under that standard, and we suspend the accused from the practice of law for 120 days.

## I. FACTS

A. *General Background*

The accused, who was first admitted to practice in Oregon in 1981, went to work for FLIR Systems, Inc. (FLIR) in 1993. FLIR is a Portland-based company that designs and manufactures thermal imaging and stabilized camera systems for military and government use. The company's stock is traded on NASDAQ and it is regulated by the Securities and Exchange Commission (SEC). Throughout the events relevant to this proceeding, the accused was FLIR's general counsel. He also was a senior vice president in charge of FLIR's export activities, with management responsibility for the export licensing process. Thus, the accused held a dual role at FLIR: he was an executive member of FLIR's management team as well as an in-house corporate legal advisor.

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Oregon Code of Professional Responsibility applies.

The misconduct charge against the accused relates to representations that the accused made to auditors concerning a $4.1 million sale of goods by FLIR. More specifically, the accused was one of several corporate executives who signed a management representation letter confirming, to the best of their individual knowledge and belief, certain facts relating to FLIR's 1998 business activities. The representations included a statement that FLIR had a fixed commitment as of the end of 1998 for the $4.1 million sale. Based on those representations, the auditor approved FLIR's 1998 financial statements, in which the $4.1 million was treated as received revenue. In fact, however, FLIR did not have a fixed commitment for the $4.1 million sale, and FLIR's 1998 financial statements significantly overstated FLIR's revenue as a result.

On appeal, the pertinent historical facts—what happened and when—are largely undisputed. What is disputed is the accused's mental state at the time of certain events— that is, whether the accused, when he signed the management representation letter, did so knowing that there was no fixed commitment for the $4.1 million sale. Below, we describe the facts as we find them by clear and convincing evidence. In the context of our analysis of the contentions on review, we discuss the competing evidence pertaining to the accused's mental state and our resolution of that disputed factual issue.

B. *The $4.1 Million Transaction*

In 1998, FLIR pursued two related deals to sell camera equipment to the Colombian government for installation on Black Hawk helicopters, which were to be purchased from Sikorsky Aircraft Corporation. To facilitate the sale, Robert Coveny, FLIR's then Director of International Business Development, retained the family firm of Alfonso Jaramillo y Cia. S. en C.S. (Jaramillo), located in Bogota, Columbia, to be FLIR's independent sales agent; Jaramillo would earn a 10 to 15 percent commission in that role. The total purchase price for the transaction was $4.1 million. That amount, together with the purchase price for the helicopters, ultimately was to

be financed by the United States Congress as part of the government's drug interdiction efforts.[2] Congress approved the appropriation, at least in part, but was not scheduled to release the funds until the spring of 1999. FLIR, in turn, would not actually receive payment for the $4.1 million for the sale until some time after that.

Although FLIR would not receive the payment until 1999, FLIR's management hoped to structure the transaction so that it would qualify for accounting purposes as revenue on its 1998 financial statements. To that end, in mid-December 1998, FLIR's then Vice President of Sales, Bill Martin, obtained two "Letters of Intention" from its Columbian sales agent, Jaramillo. The letters were signed by Jaramillo's Vice President, Felipe Jaramillo (Felipe). Each of them declared that its purpose was to confirm that Jaramillo "intends to purchase" FLIR equipment in a specific configuration at a certain price so that FLIR could "make the necessary plans to insure that systems are available" for delivery in March and April of 1999. Each letter of intent also identified the "end user" of the equipment—for one of the two letters, the end user was the Colombian Air Force; for the other, the end user was the National Police of Columbia.

Shortly after Felipe signed those letters, and before the end of 1998, FLIR moved the specified equipment to a bonded warehouse in Portland. FLIR then reported the $4.1 million on its 1998 financial statements as a sale to Jaramillo under a revenue recognition practice known as "bill and hold." In general terms, a bill and hold transaction is one in which "a customer agrees to purchase the goods but the seller retains physical possession until the customer requests shipment to designated locations."[3] The revenue for such a transaction may be "recognized"—that is, treated as received, even though neither money nor goods have changed hands. The SEC, through its adherence to generally accepted

---

[2] The record is not clear about who would receive the $4.1 million (*e.g.*, Sikorsky Aircraft Corporation, some other private entity, or the military and law enforcement entities of the Columbian government purchasing the helicopters equipped with FLIR's cameras) once the federal government released the appropriation. In all events, it is clear that the money would not be paid directly to FLIR.

[3] *In the Matter of Arthur Andersen & Co.*, Exchange Act Release No 17878, 1981 WL 30839 at *3 n 1 (June 22, 1981).

accounting principles (GAAP), requires seven criteria to be met for a transaction to be properly treated as a bill and hold transaction.[4] In combination, the criteria are designed to establish that "the buyer has made an absolute purchase commitment, but is unable to accept delivery."[5] Particularly important for present purposes are the first and second criteria: that the risks of ownership have passed to the buyer and the customer has made a "fixed commitment to purchase the goods, preferably reflected in written documentation."

## C. *The 1998 Financial Statements Audit*

Corporations under the jurisdiction of the SEC, such as FLIR, are required to file annual financial statements that reflect their financial health; those statements must be audited for accuracy by an independent public accountant. *See* Securities Exchange Act of 1934 § 13(a), 15 USC § 78m(a) (2000). FLIR's audit of its 1998 financial statements began in early 1999. It was performed by the international accounting and consulting firm PricewaterhouseCoopers (PwC), which had been performing FLIR's annual audit for several years. PwC's Senior Audit Manager, Matthew Clark, was in charge of that year's audit, as he had been since 1994. Clark's responsibility entailed coordinating the audit generally, being a primary point of contact with FLIR management, and

---

[4] Under the GAAP used by the SEC, a bill and hold transaction must meet the following conditions:

"(1) The risks of ownership must have passed to the buyer;

"(2) The customer must have made a fixed commitment to purchase the goods, preferably reflected in written documentation;

"(3) The buyer, not the seller, must request that the transaction be on a bill and hold basis. The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis.

"(4) There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (*e.g.*, storage periods are customary in the industry);

"(5) The seller must not have retained any specific performance obligations such that the earning process is not complete;

"(6) The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

"(7) The equipment must be complete and ready for shipment."

*In the Matter of Stewart Parness*, Exchange Act Release No 23507, Accounting and Auditing Enforcement Release No 108, 1986 WL 712572 at *10-11 (Aug 5, 1986).

[5] Parness, 1986 WL 712572 at *10 (citation omitted).

performing the overall review of the work conducted during the audit.

In the course of the audit, Clark asked for and received a list of customers with outstanding accounts receivable. That list encompassed the bill and hold transactions on FLIR's financial statements. Clark used the list to send audit letters to a select group of those customers asking them to confirm their monetary obligations. Jaramillo was one of the customers selected, and was asked to sign and return a letter confirming that it owed FLIR $4.1 million for equipment that FLIR had delivered to the bonded warehouse.

Jaramillo did not respond to the letter, which caused Clark to become concerned. The Jaramillo transaction was a particularly significant one for FLIR's 1998 financial statements—it represented about 47 percent of FLIR's revenue for domestic bill and hold transactions for the year and about 29 percent of its worldwide revenue for transactions of that type. FLIR's only documentation of the transaction was the letters of intent signed by Felipe; FLIR could not produce purchase orders for that transaction. The lack of documentation for the $4.1 million sale, together with another customer's unsatisfactory response to one of the audit letters, prompted Clark to go to the accused "to give me a perspective from a legal point of view and also his perspective as a member of management of the company whether the company had a valid claim against their customer in these instances."

Clark could not recall if, in conferring with the accused, he discussed the Jaramillo transaction specifically with the accused, but he may have, because it was one of the transactions prompting his concern. Clark was sure, however, that he told the accused that his concerns related to the bill and hold transactions generally and the failure of some customers to return the audit letters. Clark talked to the accused more than once. Clark had those discussions with the accused, because many of the revenue recognition criteria for a bill and hold transaction "had to do with the existence of legal elements." As a result, Clark's discussions with the accused centered on the "the company's ability to enforce a claim against its customer," which Clark viewed to be "a legal question," as well as the accused's assessment of the point at

which the risk of ownership passes to the customer. The accused advised Clark that FLIR thought that it had "an enforceable claim against its customer when [the] product was completed and shipped to a bonded warehouse." The accused's position in that regard was consistent with the position that he had taken previously. In particular, during the prior year's audit, at Clark's request, the accused had provided Clark with a formal letter opinion regarding the point at which, for bill and hold transactions, he thought that the risk of loss shifted to the customer and the customer had a legally enforceable obligation for payment.[6]

In response to PwC's concerns, FLIR's management launched a campaign to document a fixed commitment to the $4.1 million sale so that the revenue for the sale could remain "booked" as revenue for 1998. The initial efforts focused on having Felipe, who had signed the Jaramillo letters of intent, sign PwC's audit letter. With that objective, Coveny accompanied Martin and FLIR's then-CEO, Ken Stringer, to a helicopter manufacturers' convention in Dallas, Texas, in February 1999, which Felipe also was attending. Coveny, Martin, and Stringer all met with Felipe and tried to persuade him to sign the audit letter prepared by PwC. Felipe refused. They did not give up, however. Coveny was dispatched to Bogota, Columbia, essentially following Felipe there from the conference in Dallas. Coveny was there for several days at the end of February. His objective remained the same: to persuade Felipe to sign PwC's audit letter. Felipe, again, refused.

---

[6] In that letter, dated February 12, 1998, the accused stated, in part:

"Because many of our shipments are for international customers, export licenses must be obtained from the U.S. Government before shipment is authorized. The licensing process is complicated and often time-consuming and requires the customer to provide an 'end-user certificate' describing the ultimate user of the system and the purposes for which the system will be used.

"Because of the length of time involved in obtaining an export license, and in recognition of the fact that [the] export licensing process is not within the control of the company, we occasionally ship completed systems to a bonded warehouse while awaiting export approval. As a practical business matter we will expend every effort to satisfy our customers and therefore we typically insure such goods while in bonded storage. Nonetheless, as a legal matter we view shipment of our products to a bonded warehouse as constituting a transfer of title and risk of loss from FLIR Systems to the customer and the creation of a legally enforceable obligation of the customer for payment."

While Coveny remained in Bogota, FLIR's management shifted strategies. The goal became to secure something akin to a purchase agreement—one that reflected a stronger purchase commitment than did the letters of intent that Felipe had signed at the end of December, but not as strong of a commitment as the audit confirmation letter that Felipe was refusing to sign. Stringer personally recruited the accused to assist. As FLIR's general counsel, the accused was to work directly with Jaramillo's lawyer, Beatriz Jaramillo (Beatriz). The accused knew at that point that PwC was specifically scrutinizing the Jaramillo transaction and that Jaramillo had not responded to PwC's audit letter. He also knew that Stringer wanted a stronger written commitment from Jaramillo for purposes of the 1998 audit. The accused described that stronger commitment as "important enough" to Stringer that Stringer had sent Coveny personally to Bogota to secure it. The accused thought that Stringer, likewise, had imposed a "strong expectation" on him to help secure that stronger commitment, and the accused "felt the pressure." The accused understood that Stringer was "keenly interested" in the success of their efforts because it was important to FLIR's ability to report the revenue on its 1998 financial statements.

Before speaking with Beatriz, the accused reviewed Jaramillo's letters of intent so that he could draft something stronger. He also was briefed by Coveny, who told him that Felipe had refused to sign the audit letter because Felipe thought it was "too firm" and "too binding." The accused's negotiations with Beatriz took place over a few-day period at the end of February 1999. Coveny met personally with Beatriz and was in her office in Bogota while the accused, who was in Portland, talked to her by phone. Eventually, several draft documents were faxed between the accused and Beatriz. They engaged in a "dialogue of drafts" via an iterative process that eventually led to something that the accused thought Beatriz would sign. Specifically, the accused first drafted an agreement with a very strong commitment. Beatriz responded by countering it with one that was as weak or weaker than the letters of intent themselves. The negotiations continued in that way—with the accused proposing language reflecting a stronger commitment to purchase and

Beatriz proposing weaker language. Ultimately, the accused agreed to go with Beatriz's original proposal—an agreement so weak that he wondered if it added anything at all. But the accused feared that it was that or nothing. As it turned out, however, it was nothing. Others in the Jaramillo family "got cold feet," and Beatriz was told not to sign anything, not even the very weak document that she originally had proposed.[7] With that, the effort to obtain a stronger commitment from Jaramillo collapsed, and Coveny returned to Portland. The accused's direct involvement came to an end with those negotiations, which he understood to have failed because "the language" of even the weakest version of the agreement was "too strong."

D. *The Favorable Audit Report*

Clark's work on the PwC audit was ongoing while Coveny, the accused, and others attempted to get stronger documentation of Jaramillo's commitment to the $4.1 million purchase. Clark, however, was told nothing about those efforts. Instead, Clark was told (not by the accused) something that was not true—that Jaramillo's failure to return PwC's audit confirmation letter was simply a result of language and cultural barriers.[8] Clark therefore did not know the facts that the accused and other FLIR management executives knew—*viz.*, that Jaramillo considered itself to be only an agent for the sale and not to be buying the equipment; that Felipe would not sign the audit letter because there was not a binding commitment; and, for the same reasons, the accused had failed in his efforts to negotiate a stronger commitment than the letters of intent reflected. Had Clark known any of those facts, he would not have approved the $4.1 million as recognized revenue in the 1998 financial statements. FLIR then would have had to record an adjustment to its 1998

---

[7] The accused destroyed the drafts, as well as deleted the electronic versions of them from his computer, pursuant to what he described as his long-standing "personal practice" for draft documents of any kind.

[8] The record does not establish who told Clark that, except that the accused did not. Nor does the record establish that the accused knew about that misrepresentation to Clark. The record does establish, however, that the representation was patently untrue. The Jaramillos are fluent in English and are very sophisticated business people who have served for many years as independent agents for American companies doing business in Columbia.

financial statements or, if it refused to do so, suffer an adverse audit opinion from PwC for what PwC would have considered to be a material misstatement.

Clark began to wrap up PwC's audit in early April 1999, a little more than one month after the accused's negotiations with Beatriz. One of Clark's final steps was to prepare a management representation letter for the signature of several of FLIR's top-level managers.[9] Such a letter is a usual procedure by which a corporation's managers are asked to confirm certain critical representations made during the audit. Clark, believing that Jaramillo did not return the audit letter due to language and cultural barriers, permitted management to confirm through that letter certain facts pertaining to a broad range of transactions that were important to the audit. Among them were the facts that had to be true for the $4.1 million sale to be recognized as 1998 revenue.

The management representation letter was lengthy (seven pages, single spaced) and detailed, and began with a representation that the facts that it contained were being confirmed by the managers "to the best of their knowledge and belief." The bill and hold transactions were the first specific transactions detailed—they appeared on the second page. Before the specific bill and hold transactions were listed, the letter "confirm[ed]" that each one met seven conditions. The conditions listed, although slightly paraphrased, matched the seven criteria that the SEC requires for a bill and hold transaction to be treated as current revenue. *See* 343 Or at 91 n 4 (listing bill and hold criteria). Of particular significance, the letter confirmed that each bill and hold transaction was one in which the risk of loss had transferred to the customer and the customer had "made (prior to the date of recording the revenue) a fixed commitment to purchase the goods via a written purchase order." The letter then listed nine domestic bill and hold transactions, the first of which was identified as the Jaramillo transaction for $4.1 million. It was the single largest transaction on the

_____

[9] Two letters, identical in their substance, were prepared and signed. The first, issued on April 12, 1999, did not have all the needed signatures. That defect was remedied with the second letter, which issued on April 20, 1999. The accused signed both letters. We therefore treat the two letters collectively as one.

list—the others ranged from $265,000 to $1.1 million. The accused was one of five FLIR managers, including Stringer, who signed the letter; he did so in his capacity as "Vice President and General Counsel." The accused understood that he needed to personally sign the letter before the auditors would conclude their work and issue their audit report. Relying on that letter, along with other information gathered in the course of the audit, Clark approved and PwC issued an "unqualified opinion" on FLIR's 1998 financial statements, which is the most favorable report that an auditor may give.[10]

### E. *FLIR's Financial Improprieties Surface*

As it turned out, FLIR lacked firm purchase commitments for many of the bill and hold transactions. Those transactions therefore failed to meet several of the accounting criteria necessary to treat the purchase prices as recognized revenue in advance of actually receiving that revenue. Those and other improper revenue recognition practices on FLIR's part later came to light. When they did, the 1998 financial statements—as well as FLIR's 1999 financial statements—were recalled, restated, and reissued. FLIR's stock fell dramatically. In response to those events, both the SEC and the United States Department of Justice (DOJ) initiated investigations into the company's dealings and practices. Also, FLIR's board of directors appointed a special committee to investigate the financial improprieties. Among other things, that special committee called for three management executives—including then-CEO Stringer, but not the accused—to resign.

In connection with the SEC investigation, the accused testified under oath about his knowledge of FLIR's financial transactions. The accused's SEC testimony established the following facts about his state of mind during the events in question.

---

[10] "An *unqualified opinion*, the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *United States v. Arthur Young & Co.*, 465 US 805, 818 n 13, 104 S Ct 1495, 79 L Ed 2d 826 (1984) (discussing hierarchy of audit opinions) (emphasis in original).

- The accused understood that his task in negotiating with Beatriz was to secure an "actual agreement to purchase" the equipment because the Jaramillo letters of intent were not a strong enough commitment to satisfy the auditors.

- The accused believed that the Jaramillo letters of intent were "conditional" and did not create a binding agreement. At one point, he suggested that he had formed that belief in reviewing the letters in advance of his negotiations with Beatriz. At another point in his testimony, he said that he had not assessed, as of the negotiations, the binding or conditional nature of the letters of intent. He had done so since that time, however, and he viewed them as too conditional to be sufficient for revenue recognition.

- The accused believed that the stronger agreement was needed so that the $4.1 million in revenue could be recorded in 1998. That objective was "pretty clear" to him from the timing and extent of the efforts to which he and others in FLIR went to get a stronger commitment, as well as from the involvement of the auditors.

- From his negotiations with Beatriz, the accused concluded that there was no "meeting of the minds" between FLIR and Jaramillo and that "fundamentally we didn't seem to have an agreement" for the $4.1 million purchase. He so advised then-CEO Stringer.

- The accused did not tell auditors that he thought that there was no firm commitment from Jaramillo for the purchase. He did not because he believed that obtaining a stronger agreement was an "internal company effort" and communications about that effort were limited to people in the sales department and executive management.

In response to the SEC's investigation, FLIR agreed to a settlement in which the SEC ordered it to cease and

desist from further SEC violations.[11] Some of the other FLIR managers—ones whom the FLIR special committee did not ask to resign—were eventually charged with fraud by the SEC, *see SEC v. Stringer*, No Civ 02-1341-ST, 2003 WL 23538011 at *2-3 (D Or, Sept 3, 2003) (describing allegations), and were criminally indicted by the DOJ, *see United States v. Stringer*, 408 F Supp 2d 1083 (D Or 2006) (dismissing indictment due to government's "egregious behavior"). The SEC and the accused, however, entered into a settlement. The accused neither admitted nor denied the findings made by the SEC; he stipulated to them only for purposes of the SEC's jurisdiction and its proceedings against him. The findings included: (1) that the accused "understood" that the sale to its independent sales representative, Jaramillo, was conditional and Jaramillo was under no obligation to purchase the equipment; (2) that the accused attempted to obtain a binding agreement from Jaramillo in connection with the audit of FLIR's 1998 financial statements; (3) that the accused signed the management representation letters without telling PwC of his negotiations with Jaramillo or his understanding that the transaction was conditional; and (4) that the accused made material misrepresentations and omitted material information in the management letters.

Based on those findings, the SEC concluded that the accused "willfully" violated the SEC rule that prohibits an officer or director of a company subject to the SEC's jurisdiction from making materially false or misleading statements or omissions in connection with an audit of the company's financial statements. The SEC imposed the sanctions proposed in the accused's settlement offer. In addition to ordering the accused to cease and desist from committing further SEC violations, the SEC barred the accused from practice before the SEC for a period of five years. *In the Matter of James A. Fitzhenry*, Exchange Act Release No 46870, Accounting and Auditing Enforcement Release No 1670, 2002 WL 31617720 (Nov 21, 2002).

---

[11] *In the Matter of FLIR Systems, Inc.*, Exchange Act Release No 46537, Accounting and Auditing Enforcement Release No 1637, 2002 WL 31159343 (Sept 30, 2002).

F. *The Bar's Disciplinary Proceeding*

The accused notified the Bar of the SEC and DOJ investigations. After its investigation of the matter, the Bar filed a complaint in November 2003 alleging that the accused had violated DR 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation). More specifically, the Bar alleged that, in signing the management representation letter, the accused had made material misrepresentations to PwC because certain of the representations pertaining to the Jaramillo transaction had been false. The accused's hearing was held on October 3 and 4, 2005.

The evidence before the trial panel included the accused's SEC testimony. The accused also personally testified in the disciplinary hearing. In his testimony before the trial panel, the accused contradicted his sworn testimony before the SEC in several significant regards. Of particular importance, the accused specifically "disavowed" his SEC testimony that, based on his negotiations with Beatriz, he had known that Jaramillo considered the letters of intent to be conditional rather than firm purchase commitments. The accused maintained, instead, that he had no recall of Beatriz ever indicating that the letters of intent were conditional only. Relatedly, and contrary to his unequivocal SEC testimony, the accused testified to the trial panel that he had not concluded from his negotiations with Beatriz that "fundamentally" there had been no agreement and no "meeting of the minds" between FLIR and Jaramillo. The accused maintained, instead, that he had not assessed the strength of the existing understanding with Jaramillo and had held no belief about it, one way or the other. When asked why his testimony before the trial panel contradicted his SEC testimony, the accused insisted his memory in 2005 of the pertinent events was better than in 2001 because he had taken more time to review documents and to refresh his recollection of what had happened in advance of testifying at his disciplinary hearing.

The trial panel issued a corrected opinion on March 3, 2006, in which it concluded that the accused knowingly had misrepresented the facts about the Jaramillo transaction in the management representation letter, in violation of DR 1-102(A)(3). In so concluding, the trial panel believed the

accused's SEC testimony over his testimony at the disciplinary hearing. The trial panel "flatly rejected" the accused's explanation that his memory was more reliable in 2005 than it had been in 2001, explaining:

> "[A]lthough the accused may have somehow believed that his testimony was true, in many particulars it was not. It was, at best, deceptive and at worst, patently false. Giving the accused the benefit of [the] doubt, the panel assumes that he was acting on the advice of counsel, but was nevertheless deceptive in disavowing his earlier sworn testimony before the SEC, and claiming that his memory is now better than it was then."

As a sanction for violating of DR 1-102(A)(3), the trial panel concluded that the accused's misconduct warranted a suspension from the practice of law for 120 days. The accused sought this court's review.

## II. DISCUSSION

DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Evaluating misrepresentation involves a two-part inquiry: (1) whether the lawyer knew that the lawyer's statement was a misrepresentation; and (2) whether the lawyer knew that it was material. *In re Gustafson*, 327 Or 636, 648, 968 P2d 367 (1998). To establish an affirmative misrepresentation, the Bar must prove by clear and convincing evidence that the accused knowingly made a false statement of material fact. *In re Kumley*, 335 Or 639, 644, 75 P3d 432 (2003). Unlike violations that require a lawyer to act with intent, "[a] lawyer acts knowingly by being consciously aware of the nature or attendant circumstances of the conduct, but not having a conscious objective to accomplish a particular result." *In re Lawrence*, 332 Or 502, 513, 31 P3d 1078 (2001). A misrepresentation is material if it "would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001).

For purposes of DR 1-102(A)(3), the initial focus is on the truth or falsity of the fact asserted. *Kumley*, 335 Or at

644-45. In this case, there is no dispute that the representations concerning the Jaramillo transaction in the management representation letter were false. The trial panel particularly emphasized that, for a proper bill and hold transaction, "a fixed commitment to purchase by a bona fide buyer" was a "fundamental requirement." The trial panel concluded that Jaramillo was merely FLIR's commissioned sales agent and, in 1998 when FLIR treated the $4.1 million as recognized revenue, "[c]learly, there was no purchaser, and hence, no purchase." The accused does not argue otherwise.

The accused does challenge, however, the trial panel's conclusion that the accused signed the management representation letter knowing that it contained representations about the Jaramillo transaction that were false. On that central issue, the trial panel effectively drew two conclusions: (1) that the accused knew when he signed the letter that there was no fixed purchase commitment between Jaramillo and FLIR; and (2) that the accused noticed and was consciously aware of the Jaramillo transaction in the listing of bill and hold transactions. The accused argues that the evidence supports neither conclusion by clear and convincing evidence.

In arguing that he lacked actual knowledge that Jaramillo had not made a fixed commitment to the $4.1 million purchase, the accused largely relies on his testimony at the disciplinary hearing. He urges that he did not, in advance of or during the negotiations with Beatriz, review the Jaramillo letters of intent to determine whether they were conditional or binding. Nor, he points out, did Jaramillo rescind or withdraw the letters of intent. The accused's brief urges that some letters of intent in fact qualify as binding contracts. Thus, the accused reasons, he necessarily had no *actual* knowledge that the Jaramillo letters of intent were inadequate in this particular instance.

The accused's sworn testimony to the SEC was to the contrary, however. In that testimony, the accused repeatedly acknowledged that he entered into the negotiations with Beatriz with the understanding that the letters of intent—which he personally had reviewed—were not sufficient for

revenue recognition. He also repeatedly acknowledged that his goal in the negotiations was to get a stronger commitment from Jaramillo and that the reason for doing so was so that the $4.1 million transaction could be reported as revenue in 1998. In addition to describing his own understanding in that regard, the accused described Beatriz as "clearly" viewing the letters of intent to be conditional only, rather than a firm agreement to purchase.[12] Finally, the accused testified, without qualification, that he concluded from his negotiations with Beatriz that "fundamentally we didn't seem to have an agreement" and there was no "meeting of the minds" between FLIR and Jaramillo for the purchase, and that he told the CEO (Stringer) as much. He also knew one fact that he did not ever deny, not even at the disciplinary hearing—he knew that Jaramillo was not willing to sign the audit letter confirming that it had made a fixed purchase commitment.

The question of what the accused actually knew thus hinges on whether we believe the accused's SEC testimony or his later equivocations and retractions. For two reasons, we believe his SEC testimony. We do so, first, because the trial panel did so. The trial panel in this case expressly found that the accused's testimony at the disciplinary hearing "in many particulars * * * was, at best, deceptive and at worst, patently false." Also, the trial panel expressly rejected "as mendacious" the accused's only explanation for his contradictory testimony (*i.e.*, that his memory had improved with the passage of time). We are satisfied from the trial panel's opinion that its assessment of the accused's credibility was based, at least in significant part, on the accused's demeanor and manner of testifying. To that extent, we give weight to the trial panel's express credibility assessments. *See, e.g.*, *In re Gustafson*, 333 Or 468, 470, 41 P3d 1063 (2002) (observing that the court gives weight to the express credibility findings of the trial panel).[13]

---

[12] The accused now contends that the court reporter for the SEC hearing did not transcribe his testimony correctly and that he stated that he denied recalling a conversation in which Beatriz had indicated that Jaramillo's agreement was conditional only. As the Bar points out, however, the accused has raised that contention *for the first time* in his brief in this court. Suffice it to say that the belated claim of a six-year-old transcription error does not detain us.

[13] We note, for future guidance, that disciplinary trial panels will aid this court greatly in these cases if they explicitly identify the basis for their witness

Our second reason for believing the accused's testimony before the SEC over his later testimony in the disciplinary hearing is our own review of the record. As part of our *de novo* review in disciplinary cases, we can and do assess credibility based on objective factors, such as the inherent probability or improbability of testimony, whether testimony is internally consistent or inconsistent, whether the testimony is corroborated or contradicted, and so on. Here, the accused's explanation to the SEC of what he knew and understood—and when he knew and understood it—is the more believable one, given the context of the surrounding circumstances, including the flurry of special efforts that the accused and others made to get a stronger agreement from Jaramillo. Moreover, the accused's testimony before the SEC appears to have been searching, forthright, and thoughtful, even when the accused could not remember certain events or details. In contrast to that, even on a cold record, the accused's testimony at the disciplinary hearing often appeared evasive, hyper-technical, argumentative, and guarded.[14] Our review of the record therefore leads us to the same credibility assessment as that made by the trial panel. We find, as did the trial panel, that the accused had actual knowledge that Jaramillo had not made—and was not willing to make—a fixed commitment for the $4.1 million purchase. His contrary testimony was false.

The next question is whether the accused was aware of the false representations about the Jaramillo transaction in the letter that he signed. Before both the SEC and the trial panel, the accused claimed that he read the management

credibility assessments. When a panel's assessment is based on the objective factors involving the intrinsic believability of competing inferences or evidence—*e.g.*, the inherent improbability of certain testimony, the existence of corroboration, and so on—this court owes no deference to that assessment, but the panel's discussion may be enlightening and have persuasive force. When the panel's assessment is based on subjective observations of a witness's demeanor and the manner in which the witness testifies, the trial panel explicitly should state that its findings are *demeanor-based*, *because this court appropriately defers to the trial panel's* superior position to assess credibility on that basis. When, finally, the panel's assessment is based both on objective and subjective factors, the trial panel should identify the role that both play in the panel's credibility assessment so that this court can determine how much weight to give to the panel's findings.

[14] At points, the chair of the panel had to caution the accused to, for example, conduct himself with courtesy toward counsel for the Bar.

representation letter before signing it, but that he did so only "to determine the accuracy of the legal representations." He further claimed that he had viewed the bill and hold transactions as purely accounting matters. By the accused's count, only four of the 31 numbered paragraphs in the letter related to legal representations; all others were accounting representations. As to those accounting representations generally, and the bill and hold transactions in particular, the accused believed that he could rely on the signatures of the other managers signing the letters. That is, he did not think that the representations relating to the bill and hold transactions were his responsibility, and he relied on the fact that other FLIR managers had signed off on those representations as true to the best of their knowledge and belief. Additionally, in his brief, the accused describes his negotiations with Beatriz as a mere "brief interaction" and asserts that the Jaramillo transaction simply was not memorable enough to have "in mind" when he signed the letters.

The accused's arguments do not persuade us. Given the circumstances, we simply do not believe that the accused failed to notice the listing of the Jaramillo transaction. By the accused's own account, he read the entire letter with sufficient attention to distinguish legal from accounting matters. The Jaramillo transaction was conspicuously listed on the second page of the letter, as the first of nine bill and hold transactions; the $4.1 million purchase amount was equally conspicuous. The accused did not assert that he did not in fact see it, and we do not believe that he could have failed to see it on even the most cursory reading of the letter.

More fundamentally, we do not believe that the accused considered the representations to be purely of an accounting nature. The letter that the accused signed confirmed that, with respect to the bill and hold transactions, including the Jaramillo transaction, the risk of loss had passed to the customer. The letter also confirmed that "[t]he customer has made (prior to the date of recording the revenue) a fixed commitment to purchase the goods via a written purchase order[.]" In his capacity as FLIR's general counsel, the accused had consulted with Clark in connection with Clark's audit of bill and hold transactions. To determine how to treat the matters as an accounting matter, Clark needed

the accused's legal perspective. During the prior year's audit, in 1998, the accused had given Clark his legal advice on risk of loss in a formal opinion letter. During the 1998 audit, Clark specifically conferred with the accused to get his perspective on legal components of the criteria for a bill and hold transaction.[15] Given those conversations with Clark, the accused cannot credibly claim that, when he came to the paragraph pertaining to the bill and hold transactions in April 1999, he did not read it with any focus or care because it had nothing to do with anything legal.[16]

Nor do we think that the accused would have failed to recall what he knew—*i.e.*, that Jaramillo had made no fixed purchase commitment. Despite the accused's efforts now to minimize his role and his activities, we are convinced that they were distinct and memorable to him. Not much time had elapsed between his negotiations with Beatriz and when he was asked to sign the letter—at most about six weeks. The accused acknowledged that his own involvement in those negotiations was novel—he never before had been asked to intervene in a negotiation of that kind for FLIR. The accused knew that the effort to get a stronger commitment from Jaramillo was being made so that auditors would approve recognizing the $4.1 million in revenue. He knew that Stringer was "keenly interested" in getting that agreement and recognizing that revenue in 1998, and that doing so was "important enough" to dispatch Coveny personally to Bogota. The accused personally "felt the pressure" when

---

[15] The accused categorically denied meeting with Clark on those matters during the 1998 audit. Clark's testimony on that point is more credible.

[16] That point answers the accused's contention that he was entitled to rely on the signatures of the other managers for "accounting matters" and that his signature was confirming only legal representations that he had made through the audit. But we note that, even if the bill and hold representations were purely accounting in nature, that fact would not permit the accused to sign the letter confirming those representations if, as we conclude, he knew them to be untrue. Here, the accused signed the letter in his capacity as a vice president of FLIR as well as general counsel. He confirmed all representations in the letter. The accused had a duty not to confirm even a purely accounting representation if he had personal knowledge—and here, we find that he did—that it was not true. In other words, the accused was not entitled to rely on the signatures of the other managers without inquiry or further investigation when he had personal knowledge, contrary to the representation in the letter, that Jaramillo and FLIR did not have a fixed purchase agreement.

Stringer made it the accused's job to negotiate a stronger purchase commitment. It defies belief to suggest that the accused could see the reference to the $4.1 million Jaramillo transaction in the letter, as we conclude that he did, and not have "in mind" what he knew from his personal involvement—that Jaramillo had not agreed to the deal. That being so, the accused should not have signed the management representation letter.

The final question is whether the accused's false statement was material and the accused knew it was material. *Gustafson*, 327 Or at 648. In that regard, the accused argues that, although PwC may not have been aware of his interactions with Beatriz, that interaction could not have "significantly influence[d] [its] decision-making process." *Eadie*, 333 Or at 53. The accused reasons that the auditors knew that FLIR had tried to get Jaramillo to sign the audit confirmation letter and that FLIR had been unsuccessful in doing so. According to the accused, given what the auditors already knew, the accused reasonably believed that disclosing the failed negotiations to the auditors would not have changed the outcome of the audit.

That argument falls of its own weight. Of course the auditors knew that Jaramillo did not sign and return the audit letter—that was among the reasons that the FLIR management had to confirm certain facts pertaining to the bill and hold transactions, including the representation that each customer had made a fixed commitment to the purchase. What is important is what the auditors did not know— they did not know that Jaramillo had denied making any such commitment and that the accused had concluded that there was no "meeting of the minds" and fundamentally no agreement on Jaramillo's part for the purchase. The accused knew those facts, as we have concluded. Had the auditors known *those facts* as well, instead of being misled to think that Jaramillo did not sign and return the audit letter as a result of language and cultural barriers, the outcome of the audit would have been entirely different, as Clark testified before the trial panel. The $4.1 million would either have had to come off of the books for 1998 or the audit opinion would have been unfavorable. We are satisfied that the accused,

who testified that he knew the audit could not be concluded favorably unless he signed the management representation letter, knew the materiality of the misstatements that the letter contained.

We therefore conclude that the accused's act of signing the management representation letter in April 1999 violated DR 1-102(A)(3) because, in that letter, he knowingly confirmed, among other things, that Jaramillo had made a fixed commitment to purchase FLIR equipment prior to the date of recording the revenue, which was both a false and material fact that the accused had in mind when he signed the letter.

## III. SANCTION

■■ Having concluded that the accused violated DR 1-102(A)(3), we must determine the appropriate sanction. In doing so, we recognize that the purpose of a sanction is not to penalize the accused, but is, rather, to protect the public and the integrity of the legal profession. *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989). Consistently with this court's well-established methodology, we examine the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law. *In re Huffman*, 331 Or 209, 223, 13 P3d 994 (2000). We first determine, as a preliminary matter, the appropriate sanction based on (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury that the misconduct caused. ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine whether we should adjust the preliminary sanction, and, finally, we review our prior case law for guidance in imposing the appropriate sanction. *Huffman*, 331 Or at 223.

### A. *Preliminary Assessment Under ABA Standards*

■ Under the ABA Standards, the accused's conduct as described above violated his duty to the public "to maintain the standards of personal integrity upon which the community relies." ABA Standard 5.0. The ABA Standards recognize three mental states: intentional, knowing, and negligent. As we have explained, we conclude that the accused

violated DR 1-102(A)(3) knowingly—that is, with the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. The ABA Standards suggest that, ordinarily, a public reprimand is an appropriate sanction when a lawyer knowingly engages in conduct that involves misrepresentation and that adversely reflects on the lawyer's fitness to practice law. ABA Standard 5.13.

Under the ABA Standards, the injuries caused by a lawyer's professional misconduct may be either actual or potential. *See In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992) ("[A]n injury need not be actual, but only potential, in order to support the imposition of a sanction."). Actual "injury" is actual harm to a client, the public, the legal system, or the profession that is caused by a lawyer's misconduct. ABA Standards at 7. "Potential injury" is harm that was reasonably foreseeable at the time of the lawyer's misconduct but that ultimately did not occur. *Id.*

Here, FLIR's improper revenue-booking maneuvers, including making false representations in the management representation letter at issue in this proceeding, caused the need for its 1998 financial statements to be recalled, restated, and reissued, which in turn caused the price of its shares to plummet to a fraction of their prior value.[17] As a consequence of the revenue misstatements, the SEC initiated an investigation into FLIR's revenue recognition practices and ultimately issued a cease and desist order against FLIR in 2002. The drop in the value of FLIR's stock undoubtedly caused actual injury to FLIR and its shareholders in the form of economic loss, even if the exact amount of that loss is difficult or impossible to quantify. The same is true of the SEC investigation and regulatory efforts—significant public resources undoubtedly were used, even if they too are not quantifiable.

There was also significant *potential* public and private injury. The independent audit of financial statements

---

[17] The record does not contain information about the degree to which the stock price fell. We take judicial notice that FLIR's price per share closed at $5.81 on December 31, 1998, and fell as low as 75 cents near the end of 2000. *See* http://quotes.nasdaq.com (search ticker symbol "FLIR").

filed with the SEC by publicly traded corporations is one of the most important features of the SEC's regulatory oversight of those corporations. The results of those audits, and the accuracy and integrity of the audit process more generally, greatly influence investor confidence in particular corporations, as well as public confidence in the nation's economy as a whole. In *United States v. Arthur Young & Co.*, 465 US 805, 819 n 15, 104 S Ct 1495, 79 L Ed 2d 826 (1984), the United States Supreme Court stressed that point:

> "The SEC requires the filing of audited financial statements in order to obviate the fear of loss from reliance on inaccurate information, thereby encouraging public investment in the Nation's industries. It is therefore not enough that financial statements *be* accurate; the public must also *perceive* them as being accurate. Public faith in the reliability of a corporation's financial statements depends upon the public perception of the outside auditor as an independent professional. * * * If investors were to view the auditor as an advocate for the corporate client, the value of the audit function itself might well be lost."[18]

(Emphases in original.)

To be sure, the accused was not directly and personally responsible for FLIR's accounting practices. Nor was the Jaramillo transaction the only accounting impropriety that surfaced. Also, as the trial panel observed, the accused was not the only FLIR management executive who participated in the misrepresentation at issue. But we do not view the

---

[18] Official statements of the SEC make the same point. The SEC describes its mission as one *"to protect investors,* maintain fair, orderly, and efficient markets, and facilitate capital formation." www.sec.gov/about/whatwedo.shtml (emphasis added). The SEC further explains that comprehensive, accurate financial information is critical to a sound investment decision:

> "The laws and rules that govern the securities industry in the United States derive from a simple and straightforward concept: all investors, whether large institutions or private individuals, should have access to certain basic facts about an investment prior to buying it, and so long as they hold it. To achieve this, the SEC requires public companies to disclose meaningful financial and other information to the public. This provides a common pool of knowledge for all investors to use to judge for themselves whether to buy, sell, or hold a particular security. Only through the steady flow of timely, comprehensive, and accurate information can people make sound investment decisions."

*Id.*

accused's role in causing the actual and potential injury to have been minor. In many ways, the accused's role was a pivotal one. Had he declined to sign the management representation letter, PwC would have wanted to know why. If the accused then had disclosed what he knew about the Jaramillo transaction, the truth about at least that transaction—and probably the other bill and hold transactions as well—would have come to light. In turn, PwC would not have approved the 1998 financial statements, and the improprieties would have been exposed. Instead, FLIR continued its practices for another year—through the 1999 financial statements and the audit of those statements. In effect, the accused's misrepresentation permitted FLIR's unlawful practices not only to go undiscovered for 1998, but to continue for a longer period than they otherwise would have.

The regulatory requirement of an independent audit exists to prevent the precise type of actual and potential injury that flowed from the misleading accounting in FLIR's financial statements and from the false confidence that investors were given when PwC issued its favorable audit report. The accused, who signed the management letter knowing that it would be used in that independent audit of FLIR's 1998 financial statements, shares responsibility for the ensuing actual and potential injury in common with the other FLIR executives.

B. *Aggravating and Mitigating Factors*

"[A]ggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Conversely, "mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. We agree with the trial panel that the accused's substantial experience in the practice of law, ABA Standard 9.22(i), and his deceptive testimony, ABA Standard 9.22(f), are the appropriate aggravating factors to consider in determining his sanction. We also give weight to the trial panel's credibility-bound assessment that the only real remorse expressed by the accused was "more for his predicament, than for committing any violation of the rules which govern his profession."

On the other side of the equation, we find three mitigating factors. The most important one is that the accused has no prior disciplinary record. ABA Standard 9.32(a). Also, the record establishes that the accused is otherwise of good character and has a good reputation in the community. ABA Standard 9.32(g). Finally, he has taken action to rectify his misconduct by assisting FLIR to improve its accounting practices and by becoming more knowledgeable about proper corporate accounting practices. ABA Standard 9.32(d).

Unlike the trial panel, however, we give no weight to the accused's speed in self-reporting to the Bar—that factor is more than offset by his deceptive testimony before the trial panel. Nor do we give weight to the fact that his conduct was also punished by the SEC investigation through the cease and desist order. The accused acknowledged that the SEC's order had no real effect on him, because his day-to-day work for FLIR does not involve the SEC. He also acknowledged that he has incurred no expense defending himself in the SEC or this disciplinary proceeding; FLIR has paid for his legal representation and related expenses. Finally, the trial panel noted that the accused had no selfish motive for his conduct. We do not find the opposite to be true, but we are unable to affirmatively conclude that the trial panel was correct in that regard. We therefore simply give that factor no weight.[19]

Our preliminary analysis under the ABA Standards suggests that a suspension, rather than a public reprimand, may be an appropriate sanction for the accused's misconduct. That is so because of the significant actual and potential

---

[19] The accused testified that bonuses for the executive management were set directly by then-CEO Stringer based on the revenue recognized in FLIR's annual financial statements and Stringer's personal satisfaction with each manager's performance. The trial panel was apparently satisfied that the accused was not influenced by that when he "felt the pressure" from Stringer to get a stronger commitment from Jaramillo, or when he signed the management representation letter despite his knowledge that there was no fixed commitment. Still, we find it difficult to overlook the fact that the accused personally received a bonus of $55,000 based on the 1998 financial statements. Also, at the end of 1998, the accused held FLIR stock options. For those reasons, we are not persuaded that the accused wholly lacked, at least on some subconscious level, a selfish motive. But neither do we affirmatively find the existence of such a motive.

injury caused by the accused's misconduct, and our assessment that the aggravating factors substantially outweigh the mitigating ones in this instance.

C. *Oregon Case Law*

The final step in our analysis of the sanction is to determine whether a suspension is consistent with our prior cases and, if it is, to determine the length of that suspension consistently with those cases. The accused argues that a public reprimand is appropriate because this court usually does not impose a suspension for a violation of DR 1-102(A)(3) except when the case involves aggravating factors not present here, such as prior discipline, multiple rule violations, and intentional conduct. For its part, the Bar urges that a suspension of at least 120 days is appropriate in this case because of the foreseeable injury of the accused's misconduct. To support their respective views of the appropriate sanction, both the accused and the Bar try to fact-match the prior cases to the circumstances that this case presents.

That exercise is understandable but, in this case, of limited assistance. We agree with the Bar that this court's prior cases support a suspension rather than a reprimand. In general, the cases in which this court has imposed a public reprimand have been ones involving private misrepresentations.[20] On the other hand, this court generally has imposed a suspension when a lawyer has, in some sort of professional capacity, made misrepresentations that served to mislead governmental or regulatory authorities.[21] Given the significance of the management representation letter to the independent audit and, in turn, the significance of that audit to

---

[20] *See, e.g., In re Boardman*, 312 Or 452, 822 P2d 709 (1991) (imposing public reprimand for misrepresenting to third party that accused's client was personal representative of estate); *In re Miller*, 287 Or 621, 601 P2d 789 (1979) (imposing public reprimand for failing to advise parties depositing bail that monies would be returned to criminal defendant and not to them and failing to advise same parties of conversion in status from a court-appointed attorney to retained attorney for a fee, which would be payable only from bail deposited); *In re Sims*, 284 Or 37, 584 P2d 766 (1978) (imposing public reprimand for signing client's name to verification of a response in a marriage dissolution and notarizing client's signature).

[21] *See, e.g., In re Spencer*, 335 Or 71, 58 P3d 228 (2002) (60-day suspension for registering nonresident's RV in Oregon to avoid taxes and fees); *In re Benson*, 317 Or 164, 854 P2d 466 (1993) (imposing six-month suspension for preparing and recording false deeds of trust on client's real property); *In re Dinerman*, 314 Or 308, 840 P2d 50 (1992) (imposing 63-day suspension for knowingly making false statements to assist client in obtaining straw loan from bank).

the SEC's regulatory oversight, we agree that the accused's misrepresentation in this case justifies a suspension.

In setting the length of that suspension, however, this court's prior cases are not helpful. The circumstances of this case are unprecedented in terms of the actual injury inflicted on shareholders and the gravity of the potential injury to the shareholders and the public more generally. Again, we emphasize, as we did earlier, that the accused was not a lone actor in what ultimately became FLIR's financial scandal. But the others involved were not lawyers, and they are not held to the standards to which lawyers are held. The accused's role was a significant one, and the choice that he made to sign the management representation letter containing material false statements is the type of conduct that significantly erodes public confidence in the integrity of the legal profession. That much, alone, warrants a lengthy suspension. We are also persuaded that a lengthy suspension is warranted by the aggravating factor of the accused's deceptive testimony in this proceeding. Considering all the circumstances of this case, we conclude that the appropriate sanction for the accused's misconduct is a suspension from the practice of law for 120 days.

The accused is suspended from the practice of law for 120 days, commencing 60 days from the effective date of this decision.