Argued and submitted March 6, complaint dismissed July 17, 2008

# In re Complaint as to the Conduct of

## MONTGOMERY W. COBB,
*Accused.*

## (OSB 05-07; SC S054584)

190 P3d 1217

Montgomery W. Cobb, Newberg, in *propria persona*, argued the cause and filed the briefs. With him on the briefs were Eric M. Bosse and Katharine W. Mathews, Newberg.

Stacy J. Hankin, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The accused in this lawyer disciplinary case represented entities that invested and participated in a tax avoidance enterprise created by Walter J. Hoyt III (Hoyt).[1] The Bar's allegations against the accused fall into two categories. The first set of charges alleges that the accused committed ethical violations in his representation of Hoyt & Sons Master Limited Partnership (MLP), a Hoyt entity that was a debtor in a Chapter 7 bankruptcy.[2] The Bar alleges that MLP falsely reported to the bankruptcy court that it had no significant assets or income, when, in fact, MLP owned promissory notes, had the right to receive payments on those notes from investor partnerships, and was receiving or diverting those payments. The Bar charges that the accused made false representations and acted dishonestly by filing MLP's false financial disclosure statement and schedules and by giving false answers to questions posed by the bankruptcy trustee; that the accused engaged in conduct prejudicial to the administration of justice by failing to file both an amended financial disclosure statement setting forth the existence of the notes and payments and a statutorily required statement of his fees; and that the accused failed to call upon MLP to rectify its bankruptcy fraud.

As we will discuss, we conclude that the Bar did not prove its first set of charges by clear and convincing evidence. In large part, our conclusions rest on the Bar's failure to prove that MLP had the right to receive note payments from the investor partnerships and that the accused knowingly made false statements about those notes and payments.

---

[1] In 2001, the federal government convicted Hoyt for conspiracy, mail fraud, bankruptcy fraud, and money laundering, resulting in a sentence of nearly 20 years imprisonment. *United States v. Hoyt*, 47 Fed Appx 834 (9th Cir 2002).

[2] To be precise, the Bar charges that the accused violated ethical rules in his representation of two entities that were debtors in the Chapter 7 proceeding. The primary debtor was Hoyt & Sons Master Limited Partnership (MLP). The other debtor was Hoyt & Sons Management Company (Management Company). Because the Bar's allegations focus primarily on MLP, and because the additional allegations relating to Management Company do not affect our analysis, we will specifically address only the allegations relating to MLP.

The second set of charges that the Bar filed against the accused alleges that the accused violated conflict of interest rules. For several years before the accused represented MLP, he represented the partnerships that had invested in the Hoyt enterprise. The Bar charges that the accused had a conflict of interest in undertaking representation of MLP because the interests of MLP and the investor partnerships were actually or potentially adverse and the accused nevertheless (1) simultaneously represented both; and (2) continued to represent the investor partnerships after he withdrew from his representation of MLP. As we will explain, we conclude that the interests of MLP and the investor partnerships were not actually adverse when the accused initially agreed to represent MLP in the Chapter 7 bankruptcy and that the accused appropriately advised his clients of the potential for conflict and obtained their consent to his continued representation. We conclude that the Bar did not prove its second category of charges by clear and convincing evidence, and we therefore dismiss the Bar's complaint.

## I. FACTS

### A. *The Hoyt Enterprise*

Hoyt began his enterprise in the early 1970s. That enterprise was intended to operate in the following fashion. Each individual investor would be a limited partner in an investor partnership that would include approximately 30 other individual investors. The investor partnerships would purchase cattle[3] from Hoyt & Sons Ranches (Hoyt & Sons), entitling the partnerships to tax depreciation deductions that would flow through to the individual investors. The investor partnerships would purchase the cattle by making small cash investments and executing promissory notes to Hoyt & Sons for the remainder.[4] Another Hoyt entity, Laguna Tax

---

[3] Not all the investor partnerships invested in cattle; some invested in sheep. It is likely that all partnerships operated similarly, and, because the particular livestock that each partnership owned is not material to our analysis, we will describe and refer to only the purchase and ownership of cattle.

[4] As general partners, the individual investors would be liable for the partnership debt represented by the promissory notes, and, in addition, the individual investors would execute partnership and subscription agreements agreeing to pay their pro-rata portions of the promissory notes executed by the investor partnerships and agreeing to be bound to pay their partnerships' notes in their entirety, should the other individual investors fail to pay their portions.

Service, would prepare the individual investors' tax returns. The individual investors would pay 75 percent of their resulting tax savings toward their partnership note obligations and retain 25 percent of those savings for themselves. The money that the individual investors paid would be dispersed to various other Hoyt entities that managed and maintained the cattle herds. After 15 years, the note obligations would be paid in full, and the cattle would be sold.

In the beginning, the Hoyt enterprise likely operated as we have described. To what extent it continued to do so over time is unclear, and that lack of clarity has a significant effect on the result in this proceeding.

In the late 1980s or early 1990s, Hoyt & Sons was liquidated. At about that same time, Hoyt created MLP and intended to transfer the promissory notes made payable to Hoyt & Sons to that new entity. In approximately 1991, the Internal Revenue Service (IRS) began to freeze the tax refunds that individual investors had been receiving, and from that time forward, instead of making payments from expected refunds, investors made payments from their own funds. Whether Hoyt actually transferred the notes to MLP for consideration, whether the notes were enforceable obligations of the investors, and whether the payments by investors in 1996 and 1997 were payments on the notes or contributions to their partnerships to cover the costs of maintaining their herds are important issues in this case.

Hoyt was the creator and promoter of the enterprise we have described. He was also the managing partner of all the entities material to this case, including MLP and the investor partnerships.

B. *The Accused's Representation of Investors and Investor Partnerships*

The accused's association with Hoyt's enterprise began in 1994 when he was retained by the investor partnerships to represent a number of the individual investors in test cases against IRS personnel asserting that they had

violated the investors' constitutional rights.[5] When the accused undertook that representation, he thought that the Hoyt organization was a legitimate for-profit operation. *See Bales v. Commissioner*, 58 TCM (CCH) 431, 445 (1989) (tax court concluded that Hoyt business was "a quality operation"). Shortly thereafter, the accused undertook representation of investor partnerships to challenge the disallowance of deductions by the IRS in a number of administrative proceedings.[6] And, in 1995, the accused represented one of the investor partnerships in a federal court test case, again challenging the IRS disallowance of deductions.

In all those instances, the accused represented individual investors or investor partnerships, usually in litigation, for specific limited purposes. The accused never served as personal or general business counsel for Hoyt or any of his entities; Hoyt retained other counsel to perform those roles.

## C. *Chapter 11 Bankruptcy Proceeding*

In 1995, one of the many entities that Hoyt had created to carry out his enterprise, Hoyt & Sons Ranch Properties (Ranch Properties), filed a Chapter 11 voluntary bankruptcy. Ranch Properties leased ranch lands to another Hoyt entity, Hoyt & Sons Management Company (Management Company), which grazed cattle owned by the investor partnerships on the ranch lands. The Chapter 11 bankruptcy trustee asserted a landlord's lien on the cattle and threatened foreclosure. The investor partnerships engaged the accused to protect their cattle from the trustee's seizure and sale. Raymond Jackson, a California bankruptcy attorney with 30 years' experience, represented Management Company. Jackson and the accused brokered a settlement agreement with the Chapter 11 trustee that

---

[5] Those cases are referred to as *Bivens* cases, because the plaintiffs in those cases asserted a private right of action recognized in the Supreme Court case of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 US 388, 91 S Ct 1999, 29 L Ed 2d 619 (1971) (providing tort remedy for violation of constitutional rights).

[6] Those administrative cases are referred to as Final Partnership Administrative Adjustment (FPAA) cases. When the IRS takes action affecting a partnership, such as an audit, it does so by issuing an FPAA, and the partnership may contest the FPAA in an administrative proceeding. *See* 26 USC § 6223(a) (describing notice provisions for FPAA proceedings).

required various Hoyt entities, including MLP, to make payments to the bankruptcy estate over time. To convince the trustee to accept that agreement, Jackson and the accused submitted a draft budget entitled "Management Co and MLP Budget," which showed "monthly partnership income" of $240,000 per month.

D. *Chapter 7 Bankruptcy Proceeding*

In 1996, several individual investors, represented by attorney Eric Derbes, filed an action in Louisiana against Hoyt, Management Company, and MLP, and obtained an $11 million default judgment against them.

On February 24, 1997, the Derbes plaintiffs filed involuntary petitions in bankruptcy for Management Company and MLP, in an attempt to force them to liquidate their assets to pay the Derbes judgment. Hoyt hired Jackson, the attorney for Management Company in the Chapter 11 bankruptcy, to represent MLP. Jackson planned to assert a jurisdictional defense known as the "farmer defense," a defense under 11 USC section 303(a), which provides that farmers cannot be forced into involuntary bankruptcy. Successful assertion of that defense would avert appointment of a Chapter 7 trustee and, therefore, lessen the likelihood that a trustee would assert control over and require liquidation of the herds. Jackson asked the accused to serve as local counsel for the debtors in the Chapter 7 proceeding. The accused agreed, thinking that assertion of the farmer defense and dismissal of the Chapter 7 bankruptcy would be in the interests of his investor partnership clients, and he filed an answer on behalf of MLP raising the farmer defense.

In May 1997, Jackson drafted an affidavit for signature by Dave Barnes, a manager in the Hoyt enterprise, in support of MLP's motion to dismiss. The affidavit stated that MLP was in the business of buying and selling cattle, that it had earned gross income in the 12 months preceding February 1997 of approximately $1.4 million, and that its expenses had exceeded its income during that period. Jackson did not finalize or file the affidavit, however, because Hoyt instructed Jackson not to assert the farmer defense and

insisted that MLP was not conducting business and had no assets or income. On June 5, 1997, the bankruptcy court issued an uncontested "order for relief." *See* 11 USC § 303(h) (1997) (providing for entry of order for relief against debtor in involuntary bankruptcy). Once that order issued, MLP was required to cease business, and its income and assets became the property of the bankruptcy estate subject to the control of the trustee of the estate. *See* 11 USC § 303(f) (1997) (debtor's business may continue until entry of order for relief). In this case, the court appointed the United States Trustee, Jan Ostrovsky, and his two assistant trustees, Neal Jackson and Pamela Griffith, to perform that role. All three were experienced attorneys.

E. *The Accused Seeks to Withdraw*

When Hoyt prevented his attorneys from asserting the farmer defense, he also instructed the accused to withdraw. On June 11, 1997, the accused filed such a motion, together with a supporting affidavit indicating the limited capacity in which he had been retained:

"1. I am one of the attorneys for the debtor herein.

"2. I was retained by the debtor in this matter on a temporary basis to facilitate filing of initial pleadings and early appearances in this case, only. I was not retained to permanently represent the debtor in this matter.

"3. I have now been instructed by W.J. Hoyt III, general partner of the debtor, to take no further action in this matter and to withdraw as counsel of record."

The bankruptcy judge did not grant the accused's motion and instead prevailed upon him to continue in his capacity as local counsel to assist the court in administration of the case. The accused recognized that his continued representation of the investor partnerships potentially could pose a conflict of interest. In July 1997, the accused wrote a letter to Hoyt and three of Hoyt's independent attorneys, advising them that he had a potential conflict of interest and seeking their "advice and assistance in determining the appropriate role for me in these cases."

F. *The Accused Files Debtor's Financial Disclosure Statement and Fails to File his Report of Attorney Fees*

The order for relief that the bankruptcy court entered on June 5, 1997, required MLP to file a financial disclosure statement with attached schedules listing its income and assets. Jackson prepared the documents, had Barnes, a Hoyt manager, sign them, and forwarded them to the accused. The accused briefly reviewed the documents, and an assistant in his firm filed them. The bankruptcy court rejected the attached schedules because they were on the wrong form, and, after receiving reformatted schedules from Barnes, a secretary in the accused's office refiled them. Neither the accused nor anyone in his firm signed the financial disclosure statement or the schedules.

In bankruptcy cases, a lawyer is required to file, in accordance with 11 USC section 329, a statement disclosing any compensation paid or agreed to be paid, and the source of the compensation, for services rendered in connection with the bankruptcy. *See also* Federal Rule of Bankruptcy Procedure (FRBP) 2016(b) (1997) (procedural rule relating to filing of statements under Section 329). A lawyer must file the statement, referred to as a 329 statement, within 15 days after the order for relief is issued and must file supplemental statements within 15 days after any payment or agreement not previously disclosed. *Id.* Jackson sent his initial 329 statement to the accused for filing. The accused filed Jackson's 329 statement along with MLP's financial disclosure statement, but did not file a 329 statement of his own.

Other than filing MLP's answer, financial disclosure statement and schedules, the accused did minimal work for MLP in the Chapter 7 bankruptcy. The accused was, however, very busy with his representation of the investor partnerships in the Chapter 11 proceeding and in the administrative and federal court tax cases.

G. *The Bankruptcy Trustee Obtains and Seeks Information About Notes and Fees*

In August 1997, Jensen, an assistant United States Trustee, conducted a creditors' meeting pursuant to 11 USC

section 341. At that meeting, Jensen specifically asked Hoyt if MLP had any interest in contracts receivable, promissory notes, or "the right to receive payment from any source." Hoyt responded that MLP had "a book of accounts of notes receivable" but that the obligors had stopped paying those notes and they were not collectible. Jackson, who was present as attorney for MLP, also indicated that he was aware of the notes and that the obligors had stopped making payment. During the Section 341 hearing, Jensen encouraged Hoyt to consult with Jackson to see whether the notes should be listed in the schedules, "so that the trustee can make an independent determination as to whether or not they are viable."

On September 4, 1997, Jensen wrote to Jackson and the accused, asking that MLP file amended schedules setting forth the existence of the notes and requesting information about transfers into or out of MLP during the preceding four years. Jensen also specifically asked for a description of the attorneys' fee arrangements.

That letter placed MLP and its attorneys in a bit of a quandary as to how to accurately report MLP assets and income. At times, even after the bankruptcy court had issued the order for relief, Hoyt had insisted that MLP had assets to protect and that he wished to proceed with the farmer defense. At other times, Hoyt had declared that MLP had no assets and demanded that the attorneys accede to its liquidation. The accused also knew, as did the trustee, that, in March 1997, the Derbes plaintiffs had sued DSR in Nevada, claiming that it was the transferee of MLP's assets and that Hoyt was using DSR to hide those assets. And, on June 9, 1997, Blackburn had sent a letter to Hoyt, with a copy to the accused and others, stating that DSR had taken over the responsibilities of MLP and had been paying investor partnership bills and receiving investor's payments "on their notes."

Responding to Jensen's questions about attorney fees also would be difficult. The accused had spent the bulk of his time between February 1997, when the Chapter 7 proceeding had commenced, and September 1997, when Jensen had made his request for fee information, representing the

investor partnerships in other proceedings to preserve their herds and tax benefits.[7] The accused had not segregated his time in his billing statements, but instead had billed collectively for the time that he had spent on all Hoyt-related matters. Although the time that the accused had spent on the Chapter 7 bankruptcy was small in comparison to his other efforts, his total fees for that period were nearly $137,000. Typically the accused had received payment of his fees from Hoyt & Sons Feedlot Company (Feedlot),[8] which served as a repository for payments to and from the investor partnerships, but he had also received payments directly from investor partnerships, and in late 1996 he had begun receiving payments from DSR.

On September 8, 1997, the accused conferred with Jackson and discussed the requirement that he file a 329 statement disclosing the compensation that he had been paid in the Chapter 7 bankruptcy and its source. The accused did not immediately file a 329 statement, and he did not respond to the letter from Jensen.

Jensen followed his September 4, 1997, letter with a motion to compel MLP to file an amended financial disclosure statement, which the court granted on October 24. On October 27, the accused received a letter from Pamela Griffith, an assistant United States Trustee, which included copies of two checks that had alerted the trustee's office that MLP was continuing to operate and to receive payments from investors.

That same day, the accused determined that he could no longer represent MLP, and he wrote a letter to attorneys with the Hoyt organization advising them that he needed to resign his representation of MLP "due to the inevitable potential conflict of interest which will become actual as soon as the partnerships, which this firm has represented for a long time, assert claims against [MLP]." On October 31, 1997, the accused filed his motion to withdraw and asserted that he was doing so because it had become clear that the

---

[7] Those matters included filing an appellate brief in a tax case and representation in the Chapter 11 bankruptcy and related adversary proceedings.

[8] Feedlot sold cull cattle and steers owned by the investor partnerships.

bankruptcy would continue and that conflicts of interest would inevitably arise. Around that same time, the accused spoke with Jensen about the 329 statement that Jensen had requested. According to the accused, Jensen told the accused that they would "deal with it later."

On November 3, 1997, the accused met with Hoyt and his attorneys and discussed the nature of the payments by the individual investors and the role of DSR. The participants confirmed that there was "no paper trail" that could establish that the notes actually had been transferred to MLP and that MLP may not have paid consideration for the notes. Hoyt explained that investors were continuing to make payments to MLP as contributions to their partnerships to cover the costs of maintaining their herds and that MLP served as a temporary repository for such payments. At least some participants found Hoyt's explanations confusing and came away with many questions about the nature of the Hoyt operation.

On November 5, 1997, the accused and Jackson had a telephone meeting with Ostrovsky and Jensen, the Chapter 7 trustee and assistant trustee. The accused related the substance of that meeting to his clients and Hoyt attorneys in a letter dated November 6, 1997. The accused told them that, "[w]ith regard to the interception of money, [Jackson] and I took the position that MLP has no assets as far as we know and hasn't had any. It merely served as a conduit, although it may have had some incidental assets." The accused also answered questions about DSR, the Hoyt entity that the Derbes plaintiffs contended was being used to hide MLP assets. The accused repeated that, as to DSR, he "could only tell him the truth which is that I really do not know in detail how the financial structure is set up and know very little about DSR because that entity has not been involved in any litigation in which I have participated."

Effective November 17, 1997, the bankruptcy court granted the accused's motion to withdraw as attorney for MLP. On January 30, 1998, however, Ostrovsky, on behalf of the bankruptcy estate, waived all conflicts posed by the

accused's continuing representation of the investor partnerships, and, on February 2, 1998, Jensen confirmed that waiver in open court, stating:

> "after much discussion, it is our opinion that we are better off to waive the conflict that might exist with regard to [the accused], rather than lose him as a representative for potentially 2,500 investors, and maybe as many as 500 active investors in who knows how many partnerships. And the benefit to be derived from having him continue to represent these various entities and have one individual to whom we can communicate effectively outweighs the competing concerns we have with regard to him having represented one of these—both of these debtors previously."

The accused then sent a letter to the investor partnerships and the individual investors and sought and obtained their consent to his continued representation. Thereafter, the trustee authorized the creation of a fund to enable the investor partnerships to pay the accused directly for his continued services.

## H. *The Bankruptcy Court Consolidates the Hoyt Entities*

Once the trustee began to investigate the Hoyt enterprise, he found that he had a hard time isolating the assets that belonged solely to MLP and that the entities that comprised the Hoyt enterprise had been operated without regard to the separate existence of each. As a result, in December 1998, the bankruptcy court "substantively consolidated" all the Hoyt entities, effective from the date of the filing of the Chapter 7 proceeding. Also as a result of his investigation, the trustee decided not to assert claims against the investors for payment of the promissory notes. He determined that the note obligations were either nonexistent or unenforceable. It took the trustee several years to marshal the assets of the Hoyt estate and shut down the Hoyt enterprise. During those years, as the trustee testified, the accused worked "hand in glove" with the trustee to assist him in determining how the Hoyt enterprise had operated. However, the trustee eventually came to think that the accused himself had contributed to the losses that the estate had incurred, and the trustee asserted claims against the accused. The trustee sought, among other things, to have the

accused disgorge the attorney fees that he had received prior to the court's establishment of the fund for investor payments of attorney fees. Eventually, the accused and the trustee reached a settlement of that dispute.

## I. *The Bar's Complaint and Proceedings Below*

The Bar filed the complaint in this case in March 2005, and the trial panel issued its decision in December 2006. Two members of the three-member panel ruled that the accused had engaged in misrepresentation, dishonesty, and conduct prejudicial to the administration of justice, and that he had violated the duty to call upon his client to rectify its fraud. The third member disagreed and wrote a detailed dissent. The panel unanimously rejected the Bar's conflict of interest charges. As to the appropriate sanction, the panel majority recommended a public reprimand, reasoning that it was not clear that the accused's misconduct had resulted in harm to investors, that the accused is a conscientious, ethical, and well-respected lawyer, that "[t]here was no evidence of dishonesty," that there had been no prior disciplinary actions against the accused, and that there was no reason to believe that his conduct was likely to reoccur.

The Bar sought review, asserting that the trial panel had erred in finding that the accused had not violated the disciplinary rules regarding conflicts of interest. The Bar asks that we impose a one-year suspension as a sanction for the accused's misconduct. The accused, on the other hand, maintains that he committed no disciplinary violations and argues that the complaint should be dismissed.

## II. DISCUSSION

### A. *Standard of Review*

The standard of review in Bar matters is *de novo*:

> "The court shall consider each matter de novo upon the record and may adopt, modify or reject the decision of the trial panel * * * in whole or in part and thereupon enter an appropriate order."

BR 10.6. The Bar must prove each violation by clear and convincing evidence, BR 5.2, which means that the truth of the

asserted facts must be "highly probable." *In re Claussen*, 331 Or 252, 260, 14 P3d 586 (2000).

B. *Misrepresentation, Dishonesty, Conduct Prejudicial to the Administration of Justice, and Failure to Have Client Rectify Fraud*

■ The first category of charges relates to the accused's representation of MLP in the bankruptcy proceeding.

1. *Misrepresentation and dishonesty*

■ At the time of the accused's alleged misconduct, DR 1-102(A)(3) provided that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation."[9] To prove misrepresentation, the Bar must prove that the accused knowingly made a false statement of material fact. *In re Fitzhenry*, 343 Or 86, 101, 162 P3d 260 (2007) (citations omitted). Proving dishonesty is slightly different, however, and does not require an affirmative misrepresentation:

> "In contrast to what is required to prove an affirmative misrepresentation, the Bar may prove dishonest conduct without proving that the accused knowingly made affirmative false statements. Dishonest conduct is 'conduct that indicates a disposition to lie, cheat, or defraud; untrustworthiness; or a lack of integrity.' Although proving that a lawyer acted dishonestly does not require evidence that the lawyer *intended* to deceive, it does require a mental state of knowledge—that is, that the accused lawyer *knew* that his conduct was culpable in some respect."

*In re Skagen*, 342 Or 183, 203, 149 P3d 1171 (2006) (citations omitted; emphases in original). The Bar charges the accused with misrepresentation and dishonesty in several particulars, and we proceed to consider the merits of each.

---

[9] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct of the issue here occurred before that date, the Disciplinary Rules of the Oregon Code of Professional Responsibility apply. *In re Fitzhenry*, 343 Or 86, 88 n 1, 162 P3d 260 (2007).

### a. Financial disclosure statement and schedules

■ The Bar first alleges that the accused engaged in misrepresentation and dishonesty when he filed MLP's financial disclosure statement and schedules, which had been prepared by Jackson, the bankruptcy attorney for MLP, and signed by Barnes, a manager of MLP. We begin by considering whether, in filing those documents, the accused himself made a statement of fact. *See Fitzhenry*, 343 Or at 101 (to establish misrepresentation, Bar must prove that accused made false statement of material fact).

The accused did not sign MLP's disclosure statement or schedules, and the bankruptcy rules in effect at the time did not require that he do so. FRBP 9011 (1997).[10] At the time that the accused filed the disclosure statement, FRCP 11 provided that, by filing a document, an attorney certified that there was or would be an evidentiary basis for the facts set

---

[10] In July 1997, FRBP 9011 provided as follows:

"(a) Signature. Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, *except a list, schedule, or statement, or amendments thereto,* shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required. If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

"(b) Verification. Except as otherwise specifically provided by these rules, papers filed in a case under the Code need not be verified. Whenever verification is required by these rules, an unsworn declaration as provided in 28 U.S.C. Sec. 1746 satisfies the requirement of verification.

"(c) Copies of Signed or Verified Papers. When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original."

(Emphasis added.)

forth in the document.[11] However, the applicable bankruptcy rules did not contain a similar provision, and the bankruptcy rules, not FRCP 11, controlled.[12] *See In re Muscatell*, 116 BR 295, 298 (Bankr MD Fla 1990) (FRBP 9011, not FRCP 11, applies in bankruptcy cases). Therefore, by filing, without signing, MLP's financial statement and schedules, the accused himself did not represent that the facts in those documents were true, and he therefore did not make the affirmative representation that is necessary to a misrepresentation charge.

That does not resolve, however, the Bar's charge of dishonesty. As we have explained, an affirmative misrepresentation is not required to prove dishonesty. In considering that charge, we must decide whether MLP's disclosure statement and schedules were false and whether the accused knew that they were false when he filed them.

---

[11] In 1997, Rule 11 provided:

"(a) Signature. Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party. Each paper shall state the signer's address and telephone number, if any. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

"(b) Representations to Court. *By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,*—

"(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

"(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

"(3) *the allegations and other factual contentions have evidentiary support* or, if specifically so indentified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

"(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."

FRCP 11(a) and (b) (1997) (emphases added).

[12] FRBP 9011 was modified effective December 1, 1997, to impose a Rule 11-type requirement on attorneys who file and submit documents.

The Bar contends that MLP's schedules were false in three particulars: (1) in reporting negative gross income for calendar year 1996; (2) in reporting zero gross income for the period from January 1, 1997, until the bankruptcy proceeding commenced on February 24, 1997; and (3) in failing to list the promissory notes as assets of MLP.[13]

The Bar proved that MLP's schedules were false in reporting negative gross income for calendar year 1996. A partnership cannot have negative gross, as opposed to net, income. It appears that MLP erred in reporting its negative *taxable* income for fiscal year 1995-96, rather than its *gross* income for the calendar year.

MLP's report that it did not receive any gross income in 1997 and its failure to list the promissory notes as assets require a more difficult weighing of competing facts. The Bar proved that, in the early years of the Hoyt enterprise, investors had executed promissory notes in favor of Hoyt & Sons, that Hoyt had intended that the notes be transferred to MLP, and that Hoyt had taken the position in a federal tax case that the transfer had occurred. The Bar offered the testimony of individual investors that, in 1997, (1) they were making payments to MLP that they viewed as payments on their notes; and (2) that they thought that they were obligated to make those payments. The Bar also pointed to two documents to prove that MLP had earned income in 1997: the budget that Jackson and the accused had prepared for use in settlement discussions in the Chapter 11 case, and the draft affidavit that Jackson had prepared in May 1997 for submission to the court in the Chapter 7 case, in support of the farmer defense. In the Chapter 11 case, the trustee had asserted a lien on the cattle owned by the investor partnerships, and, to convince the Chapter 11 trustee to accept payments over time in lieu of seizure and sale of the cattle, Jackson and the accused had submitted a draft budget entitled "Management Co and MLP Budget, January 1997 to

---

[13] The Bar also alleges that MLP failed to disclose on its schedules that DSR had taken over the functions of MLP, including the collection of note payments. However, the Bar does not indicate in its brief the particular portion of the schedules that it contends requires that disclosure. That is not to say that payments to or by DSR are not relevant. DSR's role is relevant to our consideration whether MLP was hiding its assets or income diverting them to DSR.

May 1997." That budget showed "monthly partnership income" of $240,000 per month. In the Chapter 7 case, Jackson had prepared a draft affidavit dated May 6, 1997, that showed MLP gross income of $1.4 million in the preceding year.

The accused presented countervailing evidence. None of the promissory notes were made payable to MLP, and no documents were produced to establish that the notes that were made payable to Hoyt & Sons were actually transferred to MLP. The Hoyt organization did not credit payments by investors as note payments after 1988; rather, it credited those payments as contributions to capital and as "monthly payments." After 1988, the investors were not receiving the tax benefits that they had been promised and were using their own funds, rather than expected tax refunds, to make payments. As general partners, the investors were required to contribute to their partnerships their share of the costs of maintaining the herds that their partnerships owned. Those contributions were pooled and dispersed to other Hoyt entities to manage the herds. Blackburn, an investor and later a representative of the investor partnerships, testified that investors made payments to MLP, not because they owed money to MLP, but because MLP served as a temporary repository for those partnership payments until they could be transferred to other Hoyt entities. The MLP bank account was jointly owned by the investor partnerships, and the accused pointed out that one of the two checks that the Bar proved that investors had sent to MLP in 1997 was made payable to SGE 84-4, which appears to have been one of the investor partnerships. The accused testified that the "monthly partnership income" to which he and Jackson had referenced in their submitted Chapter 11 budget represented payments that the investor partnerships, as cattle owners, intended to pay for the expenses of caring for the cattle, and that those expenses were also set forth in the proposed budget. As to the income mentioned in the draft affidavit that Jackson had prepared for the Chapter 7 proceeding, Jackson never had filed that document with the court, because Jackson thought that the information contained therein was incorrect.

In weighing which of the competing positions is most worthy of belief, we find it significant that the bankruptcy trustee determined, after extensive investigation, that the note obligations were either nonexistent or unenforceable and decided not to take action against investors to collect them. The senior bankruptcy analyst assigned to both the Chapter 11 and Chapter 7 cases did not testify at the trial panel hearing, and the Bar did not offer any other expert testimony to the effect that MLP had owned the promissory notes and had a legal right to obtain payment of them. The trustee also had been unable to determine how to allocate the assets and income between the various Hoyt entities and, as a result, substantively consolidated them. Until that time, the investor partnerships had been operating as separate entities, and it is understandable that the investors would continue to make payments to the partnerships to care for their cattle even after MLP, a separate entity, was forced into bankruptcy. The investors may have thought of their monthly payments as "note payments," but that does not prove for purposes of these proceedings that those payments were required or used for the purpose of reducing note obligations. In our view, the Bar did not prove by clear and convincing evidence that MLP owned the notes or had an enforceable right to the payments that the investors made after the bankruptcy was commenced. The Bar therefore did not prove that MLP's statements of assets or income were false.[14]

■ Perhaps just as importantly, we also conclude that the Bar did not prove that the accused filed MLP's bankruptcy schedules knowing that they were false. The Bar proved that MLP's report of 1996 negative gross income was technically false, but we credit the accused's assertion that, at the time when he filed MLP's schedules in July 1997, he had not reviewed them in sufficient detail to catch that error. Neither did the accused review those schedules in sufficient detail to consider whether they were false in reporting MLP's 1997 income and assets. At the time that the accused filed the

---

[14] The Bar did establish that MLP failed to report the funds that it had received from investors as at least funds "held for others" on the bankruptcy schedules. However, the Bar did not seek to hold the accused responsible for that failure.

schedules, he considered his role to be a very limited one, and he testified at the trial panel hearing that, as a result, he did not give the schedules more than a cursory examination.

This case is distinguishable from *Fitzhenry*, in which this court concluded that, despite his protestations to the contrary, the accused lawyer in that case knew that the contents of a letter that he signed were false. The accused lawyer in that case had participated in the negotiations underlying the representations in the letter. And, the letter began with a statement that the accused lawyer's signature was intended to confirm the representations contained in the letter and the lawyer admitted that he had read the letter in its entirety with an eye toward confirming the truth of the legal matters it contained. The particular representation at issue was conspicuously listed, and in the court's view, it was legal in nature. 343 Or at 105-06. In contrast, here, the accused was not a participant in the Hoyt operations. The accused explained that he did not sign the documents that he had filed or review them to determine their truth. The accused may have had an obligation to his client or to the court to conduct a more thorough review of the documents than he did, but a breach of that duty is not the issue before us.[15] The Bar did not prove, as required by DR 1-102(A)(3), that, in filing MLP's schedules, the accused acted knowing that his conduct was culpable.

### b. Telephone conversation with trustee and counsel for trustee

By November 5, 1997, when the accused and Jackson had a telephone meeting with Ostrovsky and Jensen, the Chapter 7 trustee and his assistant trustee, the accused had become well aware that MLP's schedules did not reveal the existence of the notes or the payments by investors. However, by then, the trustee also had learned from Hoyt himself that the notes existed, and he had written the accused and Jackson asking that they file amended schedules setting forth the existence of the notes and requesting

---

[15] For that reason, we do not discuss the Bar's argument that the accused failed to fulfill the requirement found in Local Rule 110-2(b) (1997), United States District Court, District of Oregon, that local counsel "meaningfully participate" in the case.

information about transfers into or out of MLP during the preceding four years. On November 3, 1997, the accused had met with Hoyt and his lawyers to discuss the appropriate response to Jensen's request. The participants had confirmed that there were no documents transferring the notes from Hoyt & Sons to MLP and that MLP may not have paid any consideration for a transfer of the notes, and also had discussed whether the payments that the investors were making could qualify as partnership contributions for the purpose of maintaining their herds.

When the trustee made inquiry during the November 5, 1997, telephone call, the accused related that, "[w]ith regard to the interception of money, [Jackson] and I took the position that MLP has no assets as far as we know and hasn't had any. It merely served as a conduit, although it may have owned some incidental assets." The accused maintains that he did not conceal or misrepresent the assets or income of MLP in that telephone call. Instead, he simply took the legal position that the payments were not income to MLP—a legal position that the Bar has not proved was false.

The bankruptcy trustee also had inquired about DSR. The accused knew, as did the trustee, that the Derbes plaintiffs had filed an action against DSR, seeking to require DSR to pay the judgment that the Derbes plaintiffs had obtained against MLP and alleging that Hoyt fraudulently had created DSR to avoid payment of the MLP judgment. The accused also had received a copy of a letter from Blackburn to Hoyt stating that DSR had taken over the responsibilities of MLP and had been paying partnership bills and receiving partners' payments "on their notes." Further, the accused knew that DSR had been making payments to him for attorney fees. The accused answered the trustee's questions about DSR by stating that he "could only tell him the truth which is that I really do not know in detail how the financial structure is set up and know very little about DSR because that entity has not been involved in any litigation in which I have participated." The accused contends that that response was truthful, although somewhat evasive. The accused had played no part in the formation of DSR, and the fact that payments were being made to or by DSR did not establish that MLP had a right to those payments. Previously

Feedlot or the investor partnerships, not MLP, had paid the accused's fees, and the accused could not affirmatively have concluded that the payments that he had received from DSR were actually the property of MLP.

The accused was required to answer truthfully when he answered the questions that the bankruptcy trustee posed. But the accused was under no affirmative duty to produce facts in that forum with respect to, or to relay his growing concerns about, the legitimacy of the Hoyt operations. We conclude that the accused's answers navigated, just barely, the difficult line between responding truthfully and not volunteering his subjective concerns.

### 2. *Conduct prejudicial to the administration of justice*

DR 1-102(A)(4) (1997) forbade lawyers from engaging in conduct prejudicial to the administration of justice:

> "To conclude that a lawyer's conduct was prejudicial to the administration of justice under DR 1-102(A)(4), we must find that the lawyer engaged either in repeated acts causing some harm to the administration of justice or a single act that caused substantial harm to the administration of justice."

*Skagen*, 342 Or at 214. The Bar contends that the accused engaged in conduct prejudicial to the administration of justice in three respects. We will examine each in order.

### a. Misrepresentation and dishonesty

The Bar contends that the conduct of the accused that it claims violated DR 1-102(A)(3), discussed above, also qualifies as conduct prejudicial to the administration of justice. *See In re Wilson*, 342 Or 243, 249-50, 149 P3d 1200 (2006) (misrepresentations to court violated both DR 1-102(A)(3) and (4)). In addition to our conclusions above that the accused did not engage in misrepresentation or dishonesty, we also conclude that the accused's conduct did not prejudice the administration of justice in the Chapter 7 bankruptcy. The trustee was independently aware of the existence

of the notes, the payments by investors, the existence of DSR, and the contention that DSR was diverting funds that were the property of MLP.[16] The trustee eventually decided not to attempt collection action against the investors, and we cannot conclude that the trustee would have been any more successful in shutting down the Hoyt enterprise, collecting its assets, or obtaining funds wrongly held by DSR, if any, had the accused himself disclosed the existence of the notes or investor payments earlier in the proceeding.

### b. Failure to file amended bankruptcy schedules

The Bar also contends that the accused engaged in acts prejudicial to the administration of justice by failing to file an amended financial disclosure statement and schedules on behalf of MLP setting forth the existence of the notes. The bankruptcy trustee sent the accused a letter on September 4, 1997, asking for those documents, and, on October 24, 1997, obtained an order requiring Hoyt to file them. The Bar cites *In re Brown*, 262 Or 171, 177, 493 P2d 1376 (1972), for the proposition that a lawyer's repeated failure to respond to a court's request for information demonstrates "a lack of respect" and conduct prejudicial to the administration of justice, but that citation demonstrates only the significant difference that this case presents. In *Brown*, the trial court's rules and its numerous written requests were directed specifically to the accused, not to his client. Here, the court's rule and its one order required action by Hoyt. A lawyer does not demonstrate a lack of respect for the court each time a client is recalcitrant, and client recalcitrance alone does not establish a lawyer's violation of the code of ethics. Moreover, the court's order requiring MLP to file amended documents came so close to the date on which the accused filed his motion to withdraw that we cannot attribute to him the willful noncompliance that would justify a finding of guilt.

---

[16] The accused contends that the trustee's independent awareness of those facts should figure in our analysis of whether he engaged in misrepresentation or dishonesty. The Bar is correct that neither the intent to deceive nor reliance are required to prove a violation of DR 1-102(A)(3). *See In re Kluge*, 332 Or 251, 256, 27 P3d 102 (2001) (reliance not required to prove violation of DR 1-102(A)(3)); *In re Claussen*, 322 Or 466, 482, 909 P2d 862 (1996) (intent to deceive not required to prove violation of DR 1-102(A)(3)).

###### c. Failure to disclose attorney fees and their source

 The Bar next argues that the accused's failure to file a timely 329 statement revealing the fees he had been paid for representing MLP and the source of those payments, as required by Section 329, caused harm to the administration of justice because, if the trustee had been apprised of the payments that the accused had received, the trustee would have been entitled to collect those funds for the benefit of the estate. Under Section 329, the bankruptcy court may review fees for reasonableness and order their return only if they are excessive.[17] The Bar does not argue that the accused's fees were excessive under Section 329; rather, the Bar seems to assert that the funds used to pay the accused's fees were MLP's assets that were diverted to the accused. To prevail on that argument, the Bar was required to establish that the payments that the accused received were the property of MLP at the time that the payments were made—a fact that the Bar did not succeed in proving. The accused received payment of his fees from Feedlot, investor partnerships, and DSR. The Bar did not prove by clear and convincing evidence that the funds that those entities used to pay the accused were owned by MLP.

The Bar adduced evidence that the bankruptcy trustee was successful in reaching a settlement with the accused,

---

[17] At the time of the proceedings at issue, Section 329 provided:

"(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

"(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

"(1) the estate, if the property transferred—

"(A) would have been property of the estate; or

"(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

"(2) the entity that made such payment."

11 USC § 329 (1997).

the terms of which apparently required that the accused return at least some of the fees that he received. By the time of the settlement, however, the interests of the investor partnerships and the other Hoyt entities had been consolidated, and the assets of all Hoyt entities had become assets of the estate. The fact of that subsequent settlement does not establish that, when the accused initially received the fees, they belonged to the MLP. In addition, we observe that Jensen, an assistant trustee and an attorney who was aware that the accused had not filed a 329 statement, told the accused near the time of his withdrawal from representation of MLP that they would "deal with it later," which they in fact did. We conclude that the Bar did not prove by clear and convincing evidence that the accused caused harm to the estate by failing to file a 329 statement.

### 3. *Duty to call upon client to rectify fraud*

DR 7-102(B)(1) (1997) provided that a lawyer who recognizes that a client has perpetrated a fraud must call upon the client to rectify it:

> "A lawyer who receives information clearly establishing that [t]he lawyer's client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the lawyer's client to rectify the same, and if the lawyer's client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal except when the information is a confidence as defined in DR 4-101(A)."

The Bar alleges without specification that the accused "possessed information clearly establishing that Management Company and MLP were perpetuating a fraud upon the court in the Chapter 7 proceeding." The Bar argues that the continuing payments that the individual investors made to entities other than the trustee and the continuing operation of the Hoyt enterprise amounted to "fraud" for purposes of the disciplinary rule.

In bringing that charge and in making that argument, the Bar fails to recognize that the accused considered the investor partnerships to be entities that were separate

from MLP and that they were entitled to manage and preserve their herds. Unless MLP had a right to require note payments from the investors, and unless the partnerships maintained their herds using funds that belonged to MLP, there was nothing wrong with the investor partnerships continuing to protect their cattle. MLP was the entity that was in bankruptcy, and the bankruptcy rules required that it cease business after entry of the order for relief, but the partnerships were not similarly limited. Because the Bar failed to prove the facts necessary to prove that MLP engaged in fraud in the manner asserted, the Bar failed to prove that the accused violated DR 7-102(B)(1) (1997).

## C. *Conflict of Interest*

The Bar alleges that the accused had a current-client conflict of interest when he represented MLP in the Chapter 7 bankruptcy while simultaneously representing investor partnerships adverse to MLP. The Bar also alleges that the accused had a former-client conflict of interest in his continued representation of the investor partnerships after he had withdrawn from representation of MLP.

### 1. *Current-client conflict*

DR 5-105(E) (1997) provided that a lawyer shall not represent multiple current clients when such representation would result in an actual or likely conflict. "An 'actual conflict of interest' exists when the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client." DR 5-105(A)(1). "A 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the clients are adverse." DR 5-105(A)(2). If the current conflict was actual, then representation of both clients was prohibited, but if the current conflict was not actual, then representation was permitted if the clients consented after full disclosure. DR 5-105(F) (1997).

The Bar argues that an actual conflict of interest existed when the accused represented both MLP, as debtor, and the investor partnerships, as creditors, in the Chapter 7 proceeding. The Bar advances that, in such circumstances, the debtor seeks to minimize its assets, while the creditor

seeks to maximize them. However, when the accused initially agreed to represent MLP, he understood that the purpose of his representation would be to assist bankruptcy counsel in filing a motion to dismiss the bankruptcy proceeding altogether. The accused maintains that MLP and the investor partnerships had congruent interests in achieving dismissal because, if they were successful in doing so, they would preserve the herds from the claims of the Derbes creditors and the reach of the United States Trustee. We agree with the Bar that the test of whether there is an actual conflict of interest is objective, rather than subjective. *See In re Cohen*, 316 Or 657, 662, 853 P2d 286 (1993) (whether conflict exists depends on client's objective interests). We disagree, however, that the investor partnerships were necessarily creditors of MLP before the order for relief was entered. Until that time, the efforts of both parties were directed toward the goal of dismissing the bankruptcy.

When the order for relief was entered, Hoyt instructed the accused to withdraw. However, the bankruptcy court requested that the accused continue in his role as local counsel to provide assistance to the court. The accused acceded to the court's request, explained the potential conflict that that presented in a letter to both sets of clients, and obtained their consent to his continued representation. [18]

The Bar contends that the accused's disclosure of the potential conflict was insufficient. DR 10-101(B) (1997) defined "full disclosure" to mean "an explanation sufficient to apprise the recipient of the potential adverse impact on the

---

[18] The Bar also argues that the accused had a likely current-client conflict of interest because he represented the investor partnerships in the Chapter 11 proceeding at the same time that he represented MLP in the Chapter 7 proceeding. The Bar contends that, in the Chapter 11 proceeding, the accused was required to assert and did assert that MLP had significant assets, while, in the Chapter 7 proceeding, he took the opposite position. We do not accept the Bar's argument, because, in fact, the accused's assertions in both proceedings were consistent. In the Chapter 11 proceeding, the accused argued, on behalf of the investor partnerships, that those partnerships had the financial means to maintain their herds and that their payments would enable the obligors to fulfill their obligations under the settlement agreement. In the Chapter 7 proceeding, the accused also took the position that the investors' payments were payments to conserve their herds.

recipient of the matter to which the recipient is asked to consent," including a required "recommendation that the recipient seek independent legal advice," confirmed contemporaneously in writing. The Bar argues that the accused failed to confirm in writing his recommendation that MLP seek independent legal advice. The Bar's argument is not well taken. The accused's July 1997 letter discussing the potential conflict issues was addressed to three of Hoyt's independent attorneys, as well as to Hoyt and Blackburn. That letter laid out the potential conflict and ended with the request, "I would appreciate your advice and assistance in determining the appropriate role for me in these cases." We agree with the Bar that lawyers are required to abide by the black letter of DR 10-101(B) and that compliance with its "spirit" alone is insufficient. *See In re Lawrence*, 332 Or 502, 512, 31 P3d 1078 (2001) (accused's failure to confirm advice that client obtain independent legal advice in writing not obviated because accused arranged for client to consult with another lawyer). However, in our view, the accused in this case did meet the rule's requirement, as well as its purpose. The accused set forth the facts that created the potential conflict in a letter to his client and to independent counsel selected by his client and asked counsel to provide advice as to the potential conflict presented.

### 2. *Former-client conflict*

■ When the accused learned, in late October 1997, that the interests of the investor partnerships and MLP had changed from interests that potentially could conflict to interests that did, by then, actually conflict, he renewed his motion to withdraw as attorney for MLP. After the bankruptcy court allowed the accused to withdraw, he continued to represent the investor partnerships in the Chapter 7 proceeding. DR 5-105(C) (1997) provided that a lawyer who has represented a client in one matter is prohibited from subsequently representing another client in the same matter when the interests of the current and former clients are in likely conflict, unless the lawyer obtains the client's consent after full disclosure from both the former client and the current client. According to the Bar, the accused's disclosure of the conflict that he concedes was likely was inadequate, because he

did not reveal to the bankruptcy trustee, who represented the interests of MLP, that the investor partnerships had made payments to the accused and to Hoyt entities that instead should have been directed to MLP.

The Bar's argument is not well taken. A lawyer who recognizes a likely conflict is required to advise the client of the potentially adverse consequences of the multiple representation, not of all facts known to him that could be helpful to the former client. DR 10-101(B); *see In re Brandt/Griffin*, 331 Or 113, 135, 10 P3d 906 (2000) (lawyer must provide disclosure sufficient to apprise client of adverse consequences and permit independent counsel to assess the conflict). In the affidavit that the accused filed in support of his motion to withdraw, the accused notified the trustee of the nature of the conflict, *i.e.*, that the interests of MLP and the investor partnerships could diverge and that he could not advocate for both. The trustee gave his consent to the accused's continued representation, because the trustee determined that it was essential that he have one representative of the investors with whom he could communicate, given that 2,500 individual investors could be affected by the bankruptcy proceeding. The trustee may have benefitted had the accused also disclosed information about payments by investors or investor partnerships that would have assisted him in marshaling MLP assets, but that is not information that the accused was required to disclose to comply with conflict of interest rules.

Finally, the Bar complains that the accused failed to comply with the requirement that he recommend that the trustee obtain independent legal advice and confirm that recommendation in writing as defined by DR 10-101(B)(2). The Bar is correct factually, and the Bar is also correct, as we have noted, that compliance with the letter of the rule is required. *See In re Leuenberger*, 337 Or 183, 212, 93 P3d 786 (2004) (lawyer did not advise client to seek independent counsel regarding his conflict of interest and did not confirm advice in writing); *Lawrence*, 332 Or at 512 (court rejected lawyer's argument that he complied with "spirit" rather than "the letter of DR 10-101" in failing to advise client in writing of the potential conflict of interest); *In re Barber*, 322 Or 194, 196, 904 P2d 620 (1995) (lawyer sanctioned because he "never disclosed in writing the nature and extent of a likely or

actual conflict of interest, nor did he advise his clients to seek independent legal advice to determine whether consent to continued joint representation should be given"); *In re Altstatt*, 321 Or 324, 330-31, 897 P2d 1164 (1995) (lawyer, who was both indebted to and representing estate, failed to make full disclosure in writing); *Cohen*, 316 Or at 662 (lawyer represented both husband and wife in juvenile proceeding, in which authorities accused husband of mistreating wife's daughter, and failed to make full disclosure in writing); *In re McKee*, 316 Or 114, 129-30, 130 n 15, 849 P2d 509 (1993) (lawyer filed slander-of-title action against former client without making full disclosure in writing). In each of those cases, the client the lawyer was required to advise of the potential conflict was a client of the lawyer with whom the lawyer had had a direct and continuing relationship. In each case, the rule required the lawyer to inform the client both orally and in writing that the client should seek independent legal advice, and the lawyer failed to do so.

Here, the Bar contends that the accused failed to advise his *former* client, MLP, to seek independent legal advice. The bankruptcy court had put a trustee in control of MLP's affairs, and the trustee, who was an experienced government lawyer, also represented the bankruptcy estate. Only the trustee could decide, on behalf of the estate, whether to assent to the accused's continued representation of the investor partnerships. The trustee and the estate never had been clients of the accused and never had relied upon him to make decisions on their behalf. The circumstances of this case are unique in that the bankruptcy court specifically had appointed the trustee to provide the independent legal advice of which DR 10-101 speaks. Therefore, the accused was not required to advise the trustee to seek other advice on MLP's behalf. We find no violation of DR 5-105(C) or DR 10-101(B)(2).

## III. CONCLUSION

Hoyt created and operated a fraudulent enterprise. For many years, the accused believed in the legitimacy of that enterprise and represented the partnerships that invested in it. The accused heeded the separate existence of those investor partnerships and each of the other entities

that made up the Hoyt enterprise, including MLP. Ultimately, of course, the accused was wrong: The enterprise was not legitimate in either substance or form. But it took from February to November 1997 for the accused to understand that reality. That the accused did not act as promptly as he should have to disassociate himself from Hoyt and other aspects of his conduct in connection with the Hoyt matters are not above criticism. However, the Bar did not prove by clear and convincing evidence that the accused committed the ethical violations that it charges. We therefore dismiss the complaint in its entirety.

The complaint is dismissed.